# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| MARY REILLY, RENEE NEWTON, MIRANDA COFINO, and NANCY GOODMAN, individually and on behalf of all others similarly situated, | Case No. _____ |
| *Plaintiffs*, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ASR GROUP INTERNATIONAL, INC.; AMERICAN SUGAR REFINING, INC.; DOMINO FOODS, INC.; MICHIGAN SUGAR COMPANY; UNITED SUGAR PRODUCERS & REFINERS COOPERATIVE f/k/a UNITED SUGARS CORPORATION; COMMODITY INFORMATION, INC.; and RICHARD WISTISEN, | |
| *Defendants*. | |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................ 1

II.   PARTIES ....................................................................................................... 2

    A.    Plaintiffs ................................................................................................ 2

    B.    Defendants ............................................................................................. 2

        1.    Producing Defendants ................................................................. 2

            a.    ASR/Domino Defendants ................................................. 2

            b.    United Sugar Defendants .................................................. 3

            c.    Michigan Sugar Defendant ............................................... 4

        2.    Commodity Defendants ............................................................... 4

        3.    Agents and Co-conspirators ....................................................... 4

III.  JURISDICTION, VENUE, AND COMMERCE ............................................. 5

IV.   ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF ...................... 6

    A.    Granulated Sugar ................................................................................... 6

    B.    United States Granulated Sugar Sales .................................................... 6

    C.    Defendants Agreed To Artificially Raise, Fix, Maintain, or Stabilize Prices of Granulated Sugar ................................................................... 7

    D.    Sugar Prices Have Risen More than They Would Have in a Competitive Market during the Class Period ........................................................... 21

    E.    The Structure and Characteristics of the Production and Sale of Granulated Sugar Render The Conspiracy Economically Plausible ................... 21

    F.    There is a History of Anticompetitive Conduct in the Sugar Industry ................ 24

    G.    The Conspiracy and Overt Acts in Furtherance Proximately Caused Plaintiff and Members of the Class to Suffer Antitrust Injury and Damages ....... 24

V.    CLASS ACTION ALLEGATIONS .............................................................. 25

VI.   LIMITATIONS AND TOLLING .................................................................. 28

VII.  CLAIMS FOR RELIEF ............................................................................... 29

    COUNT I:  PRICE FIXING ................................................................................ 29

    COUNT II:  STATE ANTITRUST LAWS .......................................................... 31

    COUNT III:  STATE CONSUMER PROTECTION LAWS ............................... 32

    COUNT IV:  UNJUST ENRICHMENT ............................................................. 33

VIII. PRAYER FOR RELIEF ............................................................................... 34

IX.   DEMAND FOR JURY TRIAL ..................................................................... 35

Plaintiffs, Mary Reilly and Renee Newton, on behalf of themselves and in representative capacities on behalf of a Class of consumer purchasers of Granulated Sugar in the United States, brings claims against Defendants ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"), Michigan Sugar Company ("Michigan Sugar"), United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United," together with ASR/Domino and Michigan, the "Producing Defendants"), Commodity Information, Inc. ("Commodity"), and Richard Wistisen ("Wistisen," together with Commodity, "Commodity Defendants," and together with the Producing Defendants, "Defendants"), under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, as well as the antitrust and trade regulation laws, and common law, of the States of Vermont, Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, Wisconsin, Wyoming, and the District of Columbia, for redress of the injury and damages caused by Defendants' conspiracy to fix prices of granulated sugar in the United States from at least as early as January 1, 2019, through the date by which the anticompetitive effects of its violations of law shall have ceased, but in any case no earlier than the present (the "Class Period"). Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiffs allege:

## I.    NATURE OF THE ACTION

1.    Beginning at least as early as January 1, 2019, Defendants conspired to fix and artificially inflate the prices of Granulated Sugar sold in the United States. To implement their

price-fixing conspiracy, Defendants exchanged detailed, competitively sensitive, non-public information about Granulated Sugar prices, capacity, sales volume, supply, and demand.

2.      Among the victims of the conspiracy are U.S. consumers of Granulated Sugar, such as Plaintiffs. But for their conspiracy and unlawful acts in furtherance, Plaintiffs and members of the Class would have paid less for Granulated Sugar than they did during the Class Period. Plaintiffs bring this action for redress of the injury and damages they and members of the Class have suffered and continue to suffer by reason of Defendants' continuing violations of law.

## II.    PARTIES

### A.    Plaintiffs

3.      Plaintiff Mary Reilly is a resident of the state of Vermont.

4.      Plaintiff Renee Newton is a resident of the states of New York and Florida.

5.      Plaintiff Miranda Cofino is a resident of the state of Maryland.

6.      Plaintiff Nancy Goodman is a resident of the state of New Jersey.

7.      During the Class Period, Plaintiffs purchased Granulated Sugar, including Domino® brand Granulated Sugar.

8.      Plaintiffs were injured in their business or property as a direct, proximate, and material result of Defendants' violations of law.

9.      Plaintiffs are threatened with future injury to their business or property by reason of Defendants' continuing violations of law, absent Court intervention.

### B.    Defendants

#### 1.    Producing Defendants

##### a.    ASR/Domino Defendants

10.      Defendant ASR Group is a privately held Florida corporation and global producer and seller of Granulated Sugar based in West Palm Beach, Florida. ASR Group asserts that it is

"the world's largest refiner and marketer of cane sugar[;] we sell our branded products and service our customers in every key channel, including industrial, grocery and e-commerce, food service and specialty."

11.    Defendant ASR is a privately held Florida corporation and global producer and seller of Granulated Sugar based in West Palm Beach, Florida.

12.    Defendant Domino is ASR Group and ASR's marketing and sales subsidiary for Granulated Sugar, with a current principal place of business in West Palm Beach, Florida. Several of its officers and one of its three refineries are located in Yonkers, New York. ASR/Domino markets most of its Granulated Sugar under the Domino® brand name.

13.    ASR/Domino operates cane refineries in Crockett, California; Chalmette, Louisiana; Baltimore, Maryland; and Yonkers, New York.

**b.    United Sugar Defendants**

14.    Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation ("United States Sugar"), which owns and operates a cane mill and cane refinery in Clewiston, Florida; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC, all of which grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming.

15.    United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in Montana and Wyoming, as well as cane sugar in the Florida Everglades."

16.    United approaches the market as a unified competitor, marketing and selling all the Granulated Sugar produced by its member owners. United handles locating customers, negotiating

sales contracts, and arranging all logistics. United also sets the prices for all the products it markets and sells on its members' behalf.

### c.    Michigan Sugar Defendant

17.    Defendant Michigan Sugar, a Michigan corporation, is a cooperative consisting of 900 sugar beet owners. It is headquartered in Bay City, Michigan and has sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. It also has warehouse facilities in Michigan and Ohio.

### 2.    Commodity Defendants

18.    Defendant Commodity is a Delaware corporation based in Orem, Utah.

19.    Throughout the Class Period, the Producing Defendants utilized Commodity to implement the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information.

20.    Defendant Wistisen is the principal of Commodity who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary, and competitively sensitive non-public information between the Producing Defendants.

### 3.    Agents and Co-conspirators

21.    Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

22.    Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

4

23.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## III.    JURISDICTION, VENUE, AND COMMERCE

24.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 & 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, and the State laws cited herein.

25.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

26.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

27.     Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

28.     During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

29.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

30.     Defendants' conduct also had a substantial effect on the intrastate commerce of each of the States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, Wyoming, and the District of Columbia.

31.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District.  Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## IV.   ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF

### A.   Granulated Sugar

32.     "Granulated Sugar," also known as "refined," "white," or "table" sugar, is sugar ground to a certain size. The refining process used to create white sugar removes molasses. As its name implies, Granulated Sugar does not include sugar in any liquified form. Granulated Sugar can be manufactured from either cane sugar or beet sugar; the two versions are chemically indistinguishable. Granulated Sugar is a common ingredient found in many foods. Dry, granulated, white sugar is manufactured and sold to direct purchasers who resell, consume, or further refine it into various other types of sugar products. Granulated Sugar is the predominant form of sugar sold in the United States.

33.     Only three companies in the United States produce Granulated Sugar from cane sugar: United, ASR/Domino, and Louisiana Sugar Refining ("LSR"). A fourth company, Imperial, also produced Granulated Sugar from cane prior to being acquired by United States Sugar.

### B.   United States Granulated Sugar Sales

34.     Sales of Granulated Sugar in the United States and its territories totaled $13.2 billion in 2023.

35.     During the Class Period, the Producing Defendants, directly or through their subsidiaries or other affiliates, sold Granulated Sugar in the United States in a continuous and

uninterrupted flow of interstate commerce, including through, in, into, or from this District.

36.     During the Class Period, the Producing Defendants collectively controlled a majority of the market for Granulated Sugar in the United States.

37.     Granulated Sugar, regardless of whether it is made from sugar cane or sugar beets, is a commodity product with little or no differentiation based on the producer.

38.     Granulated Sugar producers, either directly or via their marketing affiliates, market and sell directly to customers, including food and beverage manufacturers, retailers, food service companies, and distributors.

### C.     Defendants Agreed to Artificially Raise, Fix, Maintain, or Stabilize Prices of Granulated Sugar

39.     The Producing Defendants agreed to artificially raise, fix, maintain, or stabilize prices of Granulated Sugar throughout the Class Period. In order to implement their unlawful agreement, they knowingly shared accurate, competitively sensitive, non-public information with each other, including through Commodity. There is no economically rational reason for the Producing Defendants to share such information. This information was shared for the purpose of enabling Defendants to effectuate their agreement to artificially affect prices and avoid competing with one another.

40.     The Producing Defendants used Commodity to facilitate the price-fixing conspiracy. Commodity purports to analyze the sugar industry. However, Commodity has no public presence. It does not maintain a website on the internet. It does not advertise its services to the public. It does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, as alleged herein.

41.     Commodity does not gather information through voluntary surveys or periodic polling that it anonymizes. Instead, the Producing Defendants regularly shared competitively

sensitive information about their pricing and sold positions with Commodity, and Commodity in turn contemporaneously shared that competitively sensitive information with the other Producing Defendants.

42.    Commodity does not make its reports available to purchasers of Granulated Sugar and others in the sugar supply chain, thereby strengthening the advantage that the Producing Defendants gain by sharing information only with one another as producers.

43.    Commodity does not anonymize the competitively sensitive information it receives from the Producing Defendants when passing such information on. Furthermore, Commodity does not share or offer to share this competitively sensitive information with the customers of the Producing Defendants, nor does it publicly publish the competitively sensitive information it obtains from and shares with the Producing Defendants or otherwise make it available to consumers.

44.    The Producing Defendants understand the competitive sensitivity of the information that they provide to Commodity. Commodity understands that the competitively sensitive information that the Producing Defendants share would not ordinarily be disclosed to competitors. The purpose of their sharing was to enable United, Michigan Sugar, and ASR/Domino to raise, fix, maintain, stabilize, or coordinate prices of Granulated Sugar in the United States.

45.    Using the non-anonymized competitively sensitive non-public information exchanged through Commodity, the Producing Defendants ensured that they would not undercut each other's prices and cause prices to decrease as they would in a competitive market. The Producing Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and sold positions only because Commodity collects this competitively sensitive

information from each of them and shares it with the other, pursuant to their unlawful agreement.

46.     The information exchanged through Commodity included the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, contract prices, crop yields, and crop size.

47.     Commodity provided this reciprocal information to the Producing Defendants rapidly, often within hours of having received it. The Producing Defendants then used the information they received from Commodity when deciding how much to charge for their products.

48.     The sharing of information between the Producing Defendants thus enabled them to artificially raise, fix, maintain, or stabilize the prices at which Granulated Sugar was sold to their customers pursuant to their anticompetitive agreement.

49.     As noted below, similar conduct by earlier producers of Granulated Sugar led to a consent decree in 1978 that forbade such information exchanges by competitors.

50.     A sold position is the percentage of a seller's supply of Granulated Sugar that has been sold. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward. Knowing each other's sold positions allowed the Producing Defendants to be more aggressive with pricing.

51.     Due to United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs, the Producing Defendants know that as they sell out of Granulated Sugar, they can charge higher prices because there will be little to no additional competitive product available in the market that could force them to reduce price. Thus, knowing one another's sold position allows them to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the amount of supply.

52.     Furthermore, as market leaders, the Producing Defendants account for the majority of Granulated Sugar production and sales. As a result, smaller market participants are not an effective competitive constraint on Producing Defendants' dominance.

53.     The exchange of pricing, crop size and yield, and sold position information by the Producing Defendants was intended to ensure – and did ensure – higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

54.     The Producing Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Mr. Wistisen of Commodity pursuant to their anticompetitive agreement as alleged below, in order to raise, fix, maintain, or stabilize Granulated Sugar prices.

55.     United does not publish the company's current Granulated Sugar prices or its sold position, i.e., the percentage of its crop that is booked for the current fiscal year. United's sold position was confidential, and its employees were supposed to keep that information close to the vest. Nevertheless, United shared it with Mr. Wistisen, who they knew would pass it along to ASR/Domino and other competitors.

56.     ASR/Domino has a written code of conduct with an ethics policy that prevents any ASR/Domino employee from directly talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino employees indirectly shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Mr. Wistisen knowing that he would provide the information to other competitors.

57.     Despite these internal policies, the Producing Defendants shared competitively sensitive information with one another through Commodity during the Class Period pursuant to

their agreement. The information exchanged includes the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, and contract prices. The Producing Defendants used the information they received from Commodity when deciding how much to charge for their products pursuant to their price-fixing agreement.

58.     Commodity provided this reciprocal information to the Producing Defendants rapidly, often within hours of having received it. High-level executives at the Producing Defendants, who had direct involvement in pricing, shared the sensitive information with Mr. Wistisen. The sharing of information between the Producing Defendants thus allowed them to raise, fix, maintain, or stabilize Granulated Sugar prices pursuant to the unlawful agreement.

59.     The unlawful agreement to fix prices was implemented through information exchanged through Commodity, which included current pricing, future or forward pricing, pricing strategies, and sold positions. The pricing shared among United, Michigan Sugar, ASR/Domino, and Commodity included spot prices, contract prices, and sold positions. Current spot prices can also be turned into contract prices.

60.     As an example, an email communication to Mr. Wistisen from ASR/Domino's Vice President of Industrial Sales, Alan Henderson, disclosed ASR/Domino's 2020 pricing and sold positions. ASR/Domino disclosed this confidential information knowing it would be shared with its competitors, and in return, that it would get its competitors' confidential information. Mr. Wistisen responded that he would send crop and pricing updates in the next day or two.

61.     The Producing Defendants provided accurate information to each other through Mr. Wistisen. ASR/Domino was typically "upfront" with the information it provided to Mr. Wistisen. In one example of such "upfront" information, Mr. Henderson disclosed to Mr. Wistisen in an August 2020 email pricing updates for ASR/Domino Granulated Sugar.

62.     Moreover, Mr. Wistisen told both United and ASR/Domino that he spoke with the other company, Michigan Sugar, and other sellers, and that the information he provided came directly from them. For example, Mr. Wistisen wrote to United that "Domino saying back up to $40.50 to $41," on one occasion, and on another, he wrote to Mr. Henderson that "the United [pricing and sold position] info I provided was direct from them this morning. They held a huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When discussing pricing, he stated that he did not have Michigan pricing yet, and "I hope to talk with them [Michigan] on Fri./Mon."

63.     Mr. Wistisen provided information on pricing and sold position to the Producing Defendants rapidly, often soon after having received it. On September 21, 2020, Mr. Wistisen separately asked, within minutes, Mr. Henderson and Eric Speece, a Director of Strategic Accounts at United, if there was "anything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Mr. Speece shared, "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Commodity thanked United "for keeping the communication lines open!"

64.     At the same time, Mr. Wistisen emailed Mr. Henderson, relaying, "United also 90+% (including cane) not sure on price, last indication was early Sep, were still in market and mostly firm at $36.50 and $38. Just getting started on cane side. Early read suggests $38-40, so down on the coasts and up in south." Mr. Henderson responded, "Lots of meeting[s] this week so I'll keep it short. Pricing (Cane)[:] North and mid-Atlantic - $40.50 to 41.00 FOB – prices were lower past few weeks but have firmed up to these levels. No discounting at this time. Gulf - $38.50 fob[.] West - $40.50 to $41.00 fob firm[.]" They also discussed other things such as sold positions

of ASR/Domino's competitors.

65.     On September 22, 2020, less than three hours after receiving Mr. Henderson's response, Mr. Wistisen provided United and ASR/Domino with the information from each other in emails less than a minute apart. Mr. Wistisen told ASR/Domino that "U.S. Sugar recently increased to $38.50, so looks like range is $38.50 to $41, nice increase over last month.   Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at low price, industry coverage 87%, all but NSM over 90+% booked." To United, Mr. Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below that, and other southern refiners up 10-15% from the average Waiting to confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

66.     Similarly, Mr. Wistisen shared Michigan Sugar's pricing and sold positions with United and ASR/Domino. In August 2020, he reported to Mr. Henderson at ASR/Domino, "My goodness, what a difference a month makes. Michigan 85+% booked." The next month, Mr. Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." He added with regard to pricing that Michigan was at "$38.5+, selective selling."

67.     In yet another example, Mr. Wistisen emailed both Mr. Speece at United and Mr. Henderson at ASR/Domino within approximately 40 minutes of each other in mid-November 2020 asking "where [they] would put prices?" Both responded later that day with pricing information.

68.     The communications between Mr. Wistisen and United, Michigan Sugar, and ASR/Domino were candid and specific about pricing. In a November 2020 email, ASR/Domino's Mr. Henderson emailed Mr. Wistisen, "Prices have firmed up again based on higher #16 values,

beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations. For calendar 2021: East/West - $42.00 fob[;] Gulf - $39.50 fob[;] Cane Coverage – 85-90%[.]" Mr. Wistisen responded by providing United's pricing to ASR/Domino.

69.    That same month, Mr. Wistisen emailed Domino/ASR asking for "[a]ny guidance [ASR/Domino] could give on how sub-30 cent No 16 prices makes sense?" Mr. Henderson at ASR/Domino and Mr. Wistisen exchanged messages regarding the "reason" Mr. Henderson had "heard," and Mr. Wistisen responded with real-time information from competitor United, "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22.  Selling FY21 firm, good activity, little to no competition from NSM or Western." Mr. Henderson passed this along to others in ASR/Domino, adding, "United is usually pretty upfront with [Wistisen]."

70.    In another message in April of 2021, Mr. Wistisen wrote to ASR/Domino regarding pricing. Mr. Henderson responded with specific prices and told Mr. Wistisen, "I believe your price predictions below are very accurate. Prices in PY21 are very firm."

71.    In May of 2021, ASR/Domino informed Mr. Wistisen of FY21 pricing. Mr. Wistisen responded that United's "prices [were] unchanged."

72.    In June of 2021, Mr. Wistisen sent an email to ASR/Domino sharing that he had "heard . . . United reportedly (I'll talk with them tomorrow) holding $36.50 gross  [a]nd that ASR is holding firm on the coasts." Mr. Henderson at ASR/Domino responded that "[w]ord on the street [was] United moving up a $1.00 cwt since bookings now over 60%." Mr. Henderson then went on to share future prices for the fourth quarter of 2021. In July, Mr. Wistisen responded, among other

14

things, that "Michigan . . . 80+% [booked,] and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon)." ASR/Domino's Mr. Henderson forwarded Mr. Wistisen's message to coworkers saying, "no official word yet. Let's see if we can hunt something down."

73. Also in July of 2021, Wistisen emailed Mr. Henderson saying, "the United info I provided was direct from them this morning. They are a hair shy of 90% sold."

74. In another example, Mr. Speece provided United's current pricing to Mr. Wistisen and informed him that he did not "anticipate any changes to our prices" as they had "zero problems selling at those values." Mr. Wistisen responded, "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" to which Mr. Speece responded, "Give me a ring and we can discuss." After confirming the information with Mr. Speece by phone, Mr. Wistisen wrote to ASR/Domino's Mr. Henderson a few hours later providing the information that he had a "[l]ong conversation with United" and that United "won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50."

75. The Producing Defendants' personnel also received sensitive pricing and sold position information from Mr. Wistisen on other sellers. For example, Mr. Wistisen provided Mr. Henderson pricing information regarding Cargill in July 2021, to which Mr. Henderson responded, "Cargill also makes no sense  Last I heard they were at $38.50 gross fob bulk Gramercy."

76. The Producing Defendants used the sensitive information they exchanged through Mr. Wistisen in furtherance of their anticompetitive agreement and used it to send messages to competitors about desired price levels. For example, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded pricing information from Mr. Wistisen to others at

ASR/Domino with a recommendation of what price ASR/Domino would have to offer to win a specific customer's business. In another example, United's Mr. Speece thought a competitor was selling at too low a price, so he told his colleagues that United "may want to communicate pricing earlier than the colloquium to send a message." Knowing a competitor's sold position was used to justify higher prices.

77.    ASR/Domino's Mr. Henderson frequently forwarded the information obtained about other competitors from Mr. Wistisen to his sales team and his superior. In one such example, Mr. Henderson received, and forward to his subordinates, information from Mr. Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar." In another example, Mr. Henderson sent to his boss, Mr. Sproull, information on competitors' inventory position that he received from Mr. Wistisen.

78.    United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal competitors. In one example, United's Executive Vice President, Dirk Swart, told United's Mr. Speece that he wanted Mr. Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold position. They discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone.

79.    United's Mr. Swart believes that the "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices. Customers believe that competitors sharing this information harms them.

80.    Mr. Wistisen also wrote to ASR/Domino's Mr. Henderson and asked him:

"Wondering where you would put Granulated prices and coverage?" An hour and fifteen minutes later, Mr. Henderson provided "[p]ricing for FY20."

81.     On August 17, 2020, Mr. Wistisen wrote to Mr. Henderson, providing him with sugar market updates and asked: "Where would you put cane prices and coverage?" The next day, August 18, Mr. Henderson responded: "Quick update: Pricing: [next three lines redacted]."

82.     On September 21, 2020, Mr. Wistisen wrote to Mr. Henderson again, providing several paragraphs of sugar industry news, after which he asked: "Anything new of interest on the pricing front? . . . Where would you put ASR/Domino prices . . . ?" On September 22, 2020, Mr. Henderson responded with "Pricing (Cane)." Mr. Wistisen quickly answered back: "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month."

83.     On November 16, 2020, Mr. Wistisen wrote to ASR/Domino, asking: "Curious what you're hearing on domestic raw and Granulated pricing. I haven't heard back from United yet. Did they pullback from spot market? Where would you put prices and cane coverage?" Mr. Wistisen received his response from ASR/Domino later that day.

84.     On January 19, 2021, Mr. Wistisen wrote to United delivering several paragraphs of information on developments in the sugar industry. Near the end, he asked: "Has United put out a price range on FY22?" On January 20, Mr. Speece at United responded: "We have not yet set pricing for 2022, but we will soon."

85.     On February 15, 2021, Mr. Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/Refiners, I'll send along indications." Mr. Speece quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not

formally decided. No action on 2022 just some small inquiries." Mr. Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

86.     The next day, February 17, 2021, Mr. Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50[.]"

87.     On April 29, 2021, Mr. Wistisen wrote to Mr. Henderson: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts," and provided pricing information. Mr. Henderson responded: "I believe your pricing numbers below are very accurate."

88.     On May 11, 2021, Mr. Wistisen wrote to ASR/Domino: "Are those higher spot prices, [redacted] holding up?" On May 12, 2021, Mr. Henderson responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at [redacted]."

89.     On May 18, 2021, Mr. Wistisen wrote again to ASR/Domino: "Just talked with United: prices unchanged, spot and forward."

90.     On June 16, 2021, Mr. Wistisen wrote to ASR/Domino: "The word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm   Any changes in ASR/Domino forward prices? I have you at [redacted] and [redacted]."

91.     Later, Mr. Wistisen adds: "The United info I provided was direct from them this morning."

92.     On July 12, 2021, Mr. Wistisen wrote to ASR/Domino, asking, "What's happening on the cane side of the fence? Sounds like you're now [redacted], and Imperial $49. Where would you put forward pricing and coverage?" Mr. Henderson responded: "United price increase. Rich is thinking $2.00 increase but no official word yet."

93.     There is no plausible, non-conspiratorial justification for the Producing Defendants to use Commodity to secretly share highly confidential and proprietary detailed information about their pricing and sold position. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces the intensity of competition.

94.     Defendants knew and intended that their private exchanges of competitively sensitive information about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Granulated Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

95.     The Producing Defendants are interested in achieving higher prices for Granulated Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

96.     Similarly, United at times pulled its competitive punches for fear of prices dropping. ("As with all plans of this nature where we are looking at taking share from competitors, we need to factor in competitive responses   In our minds the key is stay balanced, thoughtful where the moves will initiate relatively smaller reactions.").

97.     ASR/Domino similarly anticipated competitive reactions, used pricing to send

signals to competitors, and considered how its actions may cause market prices to decline.

98.     ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

99.     ASR/Domino also observed that the proposed acquisition of Imperial by a member of the United cooperative was a "good thing" for ASR/Domino because it would help to align United's pricing strategy with ASR/Domino's. ASR/Domino believed that after the acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry."

100.    Upon information and belief, Michigan Sugar likewise participated in the sharing of sensitive information regarding pricing and sold positions with the intention of artificially raising, fixing, maintaining, or stabilizing Granulated Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

**D.     Sugar Prices Have Risen More than They Would Have in a Competitive Market during the Class Period**

101.    Eighty percent of all sugar sold in the United States is Granulated Sugar.

102.    Although the FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible) for collaborations among competitors if it impacts no more than twenty percent of a market, the Producing Defendants accounted for fifty percent or more of the Granulated Sugar market, far above the twenty percent set forth in the FTC/DOJ Guidelines, which shows heightened antitrust risks.

103.    Granulated Sugar prices became significantly elevated during the Class Period as a

result of Defendants' conduct. This was contrary to pricing patterns prior to the Class Period.

104.    Moreover, sugar prices increased dramatically during the Class Period without a decline in the supply of sugar.

105.    In the past 20 years, the price of Granulated Sugar has doubled on an indexed basis. There is no economic rationale for the rate of price increases.

106.    United employed Mr. Wistisen at least as early as the first half of 2019 to enable it to fix or coordinate prices with ASR/Domino. Cane sugar prices are now at their highest levels since November of 1974. Pricing reached a low point in February of 2014. Prices then started trending upward for the most part, but at modest levels of progression. Commencing on or about October of 2019, prices experienced one of the steepest climbs ever, which is ongoing. During that period, the Producer Price Index ("PPI") calculated by the Federal Reserve Bank of St. Louis went from 87.6 to 97.4. After United's acquisition of Imperial in 2023, prices further increased, going from a PPI of 110.6 to 123.2 by the end of 2023.

**E.    The Structure and Characteristics of the Production and Sale of Granulated Sugar Render the Conspiracy Economically Plausible**

107.    Granulated Sugar is a commodity product and competitors' pricing and sold positions is material information.

108.    The sugar industry is also vulnerable to coordinated interaction because of its structural dynamics.

109.    United and ASR/Domino have connected ownership interests that further raise the risks of coordination.

110.    As explained above, the Producing Defendants strategically used price signals (messages) they send as well as receive. For example, United sent signals (messages) to competitors about pricing and considered how its own actions may cause market-wide prices to

decline and what to do to avoid that situation.

111.   In addition to the extensive information sharing by the Producing Defendants and the structural characteristics of the industry, there are other "plus factors" that plausibly suggest the likelihood of collusion, including, but not limited to: (1) high vertical integration, (2) high barriers to entry, (3) sugar industry consolidation and concentration, (4) inelastic supply and demand, (5) a lack of significant substitutes for Granulated Sugar, and (6) a history of antitrust violations by sugar manufacturers.

112.   The Granulated Sugar industry is almost entirely vertically integrated. In the Granulated Sugar industry, "vertical integration" means the Granulated Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Granulated Sugar in their own refining facilities, and selling their Granulated Sugar to direct purchasers.

113.   There are high barriers to becoming a manufacturer of Granulated Sugar. The start-up capital necessary to compete with today's Granulated Sugar manufacturers would be substantial. Granulated Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Granulated Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for United States Department of Agriculture loans and production allotments that enable growers to process raw sugar into Granulated Sugar without competition from imports.

114.   Due to high barriers to entry, the Granulated Sugar industry is highly concentrated.

115.   While the Producing Defendants dominate the industry, none of the remaining producers of Granulated Sugar have had a market share that remotely approaches that of the Producing Defendants.

116.    Furthermore, the industry has recently become even more concentrated when United acquired Imperial in 2023, resulting in a substantial increase in dominance by ASR/Domino and United.

117.    Demand for Granulated Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. Defendants recognize that Granulated Sugar demand is inelastic. The Producing Defendants knew that they could demand higher prices when less Granulated Sugar was available to sell. As a result, they routinely exchanged information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Granulated Sugar.

118.    Furthermore, Defendants knew that the price support programs implemented by the USDA limited the number of sources of raw sugar for refinement into Granulated Sugar and protected them from foreign competition.

119.    In sum, the Granulated Sugar industry has characteristics that make the exchanges by Defendants of competitively sensitive, non-public material internal information highly anticompetitive and allowed the Producing Defendants to raise, fix, maintain, or stabilize Granulated Sugar prices during the class period. As a result, Defendants' unlawful conduct caused Plaintiff and the Class members to pay artificially inflated prices for Granulated Sugar during the Class Period. These prices exceeded the amounts they would have paid if the prices for Granulated Sugar had been determined in a competitive market. Plaintiff and Class members have suffered antitrust injury because of Defendants' conduct.

### F.    There is a History of Anticompetitive Conduct in the Sugar Industry

120.    The sugar industry has been marked by repeated violations of the antitrust laws going back nearly 90 years.

121.    For example, The United States Supreme Court in the 1930s upheld a lower court

23

ruling that the Sugar Institute, an industry trade association, violated the antitrust laws by, among other things, requiring advance pricing announcements by manufacturers with "a requirement of adherence, without deviation, to the prices and terms publicly announced."

122.    In the 1970s, the DOJ accused sugar refiners of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing. The defendants in that case entered into a consent decree with the Department of Justice in 1978, where they were enjoined from, among other things, "agreeing to fix prices or announce price changes in advance for the sale of . . . sugar . . . and from exchanging information, directly or indirectly, as to the sale of . . . sugar."

**G.    The Conspiracy and Overt Acts in Furtherance Proximately Caused Plaintiff and Members of the Class to Suffer Antitrust Injury and Damages**

123.    Because of the Defendants' anticompetitive conduct: (1) competition in the Granulated Sugar market has been reduced or eliminated, (2) prices for Granulated Sugar have been maintained at supracompetitive levels, and (3) United States purchasers of Granulated Sugar have been deprived of the benefit of price competition.

124.    As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members paid more for Granulated Sugar than they otherwise would have and thus suffered antitrust injury and damages. The overcharges paid by Plaintiff and members of the Class for Granulated Sugar constitutes antitrust injury and harm to competition under the federal antitrust laws.

**V.    CLASS ACTION ALLEGATIONS**

125.    Plaintiffs brings this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of the following Classes, which consist of a Nationwide Class, Nationwide Repealer Subclass, and Vermont Subclass and Florida Subclass (collectively, "Class"), as follows:

a) Nationwide Class: All persons that purchased Granulated Sugar indirectly from a Defendant for end use and not for re-sale in the United States during the Class Period.

b) Nationwide Repealer Subclass: All persons that purchased Granulated Sugar indirectly from a Defendant in Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, Wyoming, or the District of Columbia, for end use and not for re-sale during the Class Period.

c) Vermont Subclass: All persons that purchased Granulated Sugar indirectly from a Defendant for end use and not for re-sale in Vermont during the Class Period.

d) Florida Subclass:  All persons that purchased Granulated Sugar indirectly from a Defendant for end use and not for re-sale in Florida during the Class Period.

e) Maryland Subclass: All persons that purchased Granulated Sugar indirectly from a Defendant for end use and not for re-sale in Maryland during the Class Period.

f) New Jersey Subclass: All persons that purchased Granulated Sugar indirectly from a Defendant for end use and not for re-sale in New Jersey during the Class Period.

126.   "Class" as defined herein, includes, and subsumes the Nationwide Class, the Nationwide Repealer Subclass, the Vermont Subclass, Florida Subclass, the Maryland Subclass, and the New Jersey Subclass.

127.   Excluded from the Class are Defendants and each of their respective officers, directors, management, employees, subsidiaries, and affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

128.   Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records

in the possession of Defendants.

129.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same conspiracy of Defendants.

130.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of members of the Class.

131.    Plaintiffs are represented by counsel with substantial experience and success in the prosecution and leadership of antitrust class actions and other complex litigation, including class actions involving agricultural food staple products and other commodities, indirect purchaser cases, and consumer protection litigation.

132.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class, thereby making damages with respect to members of the Class as a whole appropriate.

133.    Questions of law and fact common to members of the Class include, but are not limited to:

- Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Granulated Sugar in the United States and its territories;

- Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

- The scope and duration of the alleged conspiracy;

- The effect of the alleged conspiracy on the price of Granulated Sugar during the Class Period;

- The type of injury suffered by Plaintiffs and members of the Class;

- Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

- The extent to which Defendants were unjustly enriched;

- Aggregate damages suffered by Plaintiffs and members of the Class; and

- Whether Defendants acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

134.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

135.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

136.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

137.    Plaintiffs have defined members of the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class,

including, without limitation, the Class Period.

## VI.   LIMITATIONS AND TOLLING

137.   By equitable estoppel, Defendants' concealment of their unlawful conspiracy has tolled any applicable statute of limitations for Plaintiffs and members of the Class with respect to any claims and rights of action that Plaintiffs and members of the Class have alleged in this Complaint.

138.   Plaintiffs and members of the Class were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full scope of the Defendants' unlawful conduct could not be discovered until the appellate exhibit volumes from the DOJ matter were made public.

139.   In addition, throughout the Class Period, the Defendants effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs and members of the Class, and the conspiracy was inherently self-concealing.

140.   Plaintiffs and members of the Class relied on Defendants' promises to obey the law and act with integrity.

141.   ASR Group's Code of Ethics and Business Conduct states in part, "ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations." It further states that it seeks success "only . . . while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work." Regarding antitrust and competition laws, the Code states that ASR Group is "prohibited" from engaging in "agreements with competitors to fix or control prices," and that it "may not engage in direct or indirect discussions or contacts with competitors regarding . . . [p]rices to be charged by ASR

Group or others or regarding other terms and conditions of sales[;] [t]erritories or markets in which products will be sold[;] . . . [and] [b]usiness, marketing or strategic plans."

142.    United's Code of Business Conduct and Ethics states that "[o]beying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents, and other representatives must respect and obey the laws of the cities, states, and countries in which we operate." It further states that "[w]e seek to outperform our competition fairly and honestly," and that there is an "obligation to protect [United's] assets [including United's] confidential information[.] Unauthorized use or distribution of United Sugars' confidential information is prohibited."

143.    Michigan Sugar's commitment to "Sustainability and Corporate Social Responsibility" states that the company "live[s] by our values – Excellence, Pride, Integrity, Compassion, and Trust. This is the foundation of a business environment that sets respect and dignity for coworkers, suppliers, customers, and partners as an absolute expectation."

144.    These promises to obey the law and behave with integrity prevented Plaintiffs and members of the Class from discovery Defendants' conduct earlier.

## VII.    CLAIMS FOR RELIEF

**COUNT I:**
**PRICE FIXING**

**Section 1 of the Sherman Antitrust Act**
**15 U.S.C. § 1**

138.    Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

139.    The Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to raise, fix, maintain, or stabilize Granulated Sugar prices.

140.    Since at least 2019, Defendants agreed with each other to exchange competitively sensitive non-public information regarding prices, output, and costs in order to raise, fix, maintain, or stabilize the prices of Granulated Sugar. The agreement was intended to and did unreasonably restrain trade, suppress competition, and had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States.

141.    Pursuant to the agreement, the Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Granulated Sugar sold to Plaintiffs and members of the Class.

142.    This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

143.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

144.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## COUNT II:
## STATE ANTITRUST LAWS

145.    Plaintiffs repeat and reasserts each of the preceding allegations as if fully set forth herein.

146.    By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under:

     i.   Vermont, 9 V.S.A. § 2453a(a)

     ii.   Alabama, Ala. Code. § 6-5-60, *et seq*.

     iii.   Arizona, Ariz. Rev. Stat. § 44-1401, *et seq*.

     iv.   Arkansas, Ark. Code. Ann. § 4-75-211, *et seq*.

     v.   California, Cal. Bus. & Prof. Code § 16700, *et seq*.

     vi.   Connecticut, Conn. Gen. Stat. § 35-24, et seq.

     vii.   District of Columbia, D.C. Code § 28-4501, *et seq*.

     viii.   Georgia, Ga. Code. § 16-10-22, *et seq*.

     ix.   Hawaii, Hawaii Rev. Stat. § 480-1, *et seq*.

     x.   Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, *et seq*.

     xi.   Iowa, Iowa Code § 553.1, *et seq*.

     xii.   Kansas, Kan. Stat. Ann. § 50-101, *et seq*.

     xiii.   Maine, Maine Rev. Stat. tit. 10, § 1101, *et seq*.

     xiv.   Maryland, Md. Code, Comm. Law § 11-201, *et seq*.

     xv.   Michigan, MCL § 445.773, *et seq*.

     xvi.   Minnesota, Minn. Stat. § 325D.49, *et seq*.

     xvii.   Mississippi, Miss. Code Ann. § 75-21-1, *et seq*.

     xviii.   Nebraska, Neb. Rev. Stat. § 59-801, *et seq*.

     xix.   Nevada, Nev. Rev. Stat. § 598A.010, *et seq*.

     xx.   New Mexico, N.M. Stat. Ann. § 57-1-1, *et seq*.

     xxi.   New York, N.Y. Gen. Bus. Law § 340, *et seq*.

xxii.   North Carolina, N.C. Gen. Stat. § 75-1, *et seq.*

xxiii.  North Dakota, N.D. Cen. Code § 51-08.1-01, *et seq.*

xxiv.   Oregon, Or. Rev. Stat. § 646.705, *et seq.*

xxv.    Rhode Island, R.I. Sat. § 6-36-1, *et seq.*

xxvi.   South Carolina, S.C. Code Ann. § 39-3-10, *et seq.*

xxvii.  South Dakota, S.D. Cod. Laws § 37-1-3.1, *et seq.*

xxviii. Tennessee, Tenn. Code Ann. § 47-25-101, *et seq.*

xxix.   Utah, Utah Code. Ann. § 76-10-3101, *et seq.*

xxx.    West Virginia, W.V. Code § 47-18-1, *et seq.*

xxxi.   Wisconsin, Wisc. Stat. § 133.01, *et seq.*

xxxii.  Wyoming, Wyo. Stat. Ann. § 40-4-101, *et seq.*

## COUNT III:
## STATE CONSUMER PROTECTION LAWS

147.    Plaintiffs repeat and reassert each of the preceding allegations as if fully set forth herein.

148.    By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under:

i.    Vermont, 9 V.S.A. § 2453a

ii.   Alaska, Alaska Stat. § 45.50.531.

iii.  Arizona, Ariz. Rev. Stat. §§ 44-1521, *et seq.*

iv.   Arkansas, Ark. Code §§ 4-88-101, *et seq.*

v.    California, California Bus & Prof. Code §§ 17200, *et seq.*

vi.   Connecticut, Conn. Gen. Stat. § 42-110, *et seq.*

vii.  District of Columbia, D.C. Code Ann. §28-3901, *et seq.*

    viii.   Florida, Fla. Stat. § 501.201, *et seq*.

    ix.   Hawaii, Hawaii Rev. Stat. § 480-2, *et seq*.

    x.   Kansas, Kan. Stat. Ann. § 50-623, *et seq*.

    xi.   Massachusetts, Mass. Gen. Laws, chapter 93A § 1, *et seq*.

    xii.   Michigan, Mich. Comp. Laws § 445.901, *et seq*.

    xiii.   Minnesota, Minn. Stat. § 325F.69, *et seq*.

    xiv.   Mississippi, Miss. Code § 75-24-1, *et seq*.

    xv.   Missouri, Mo. Rev. Stat. § 407.020.

    xvi.   Nebraska, Neb. Rev. Stat. §§ 59-1601, *et seq*.

    xvii.   Nevada, Nev. Rev. Stat. §§ 598.0903, *et seq*.

    xviii.   New Hampshire, N.H. Rev. Stat. §§ 358-A:1, *et seq*.

    xix.   New Jersey, N.J. Stat. § 56-8-1, *et seq*.

    xx.   New Mexico, N.M. Stat. Ann. §§ 57-12-1, *et seq*.

    xxi.   New York, N.Y. Gen. Bus. Law § 349, *et seq*.

    xxii.   North Carolina, N.C. Gen. Stat. §§ 75-1.1, *et seq*.

    xxiii.   Rhode Island, R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

    xxiv.   South Carolina, S.C. Code Ann., §§ 39-5-10, *et seq*.

## COUNT IV:
## UNJUST ENRICHMENT

149.    Plaintiffs repeat and reassert each of the preceding allegations as if fully set forth herein.

150.    Defendants financially benefited from their unlawful acts at the expense of Plaintiffs and members of the Class, who paid supra-competitive prices for Granulated Sugar during the Class Period.

151.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution to Plaintiffs and members of the Class.

152.    Defendants should be made to disgorge their ill-gotten gains to a constructive trust created for the benefit of Plaintiff and members of the Class, from which Plaintiffs and members of the Class may obtain restitution.

153.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to relief under the laws of the States of Vermont, Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, Wisconsin, Wyoming, and the District of Columbia.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully pray that This Honorable Court:

A.    Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that they be named Class Representatives, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.    Adjudge that Defendants violated federal antitrust laws, as set forth above;

C.    Adjudge that Defendants violated state antitrust and trade regulation laws, as set forth above;

D.      Award Plaintiffs and members of the Class actual, treble, punitive, and exemplary damages; attorneys' fees and costs of suit, including costs of consulting and testifying experts; and pre- and post-judgment interest;

E.      Order disgorgement and restitution;

F.      Enjoin Defendants from their continuing violations of federal and state law;

G.      Grant prospective injunctive relief, including structural relief, to prevent and restrain any future violations of law;

H.      Grant such other, further, and different relief as may be just and proper.

## IX.    DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a Trial by Jury as to all issues so triable.

Dated:  August 13, 2024                            Respectfully submitted,

                                                   /s/ *Robin F. Zwerling*
                                                   Robin F. Zwerling
                                                   Jessica Hermes
                                                   **ZWERLING, SCHACHTER &**
                                                   **ZWERLING, LLP**
                                                   41 Madison Avenue
                                                   New York, NY 10010
                                                   Telephone: (212) 223-3900
                                                   Email: rzwerling@zsz.com
                                                           jhermes@zsz.com

                                                   ***Counsel for Plaintiffs and the Proposed***
                                                   ***Class***